Argued July 10, 1978, affirmed as modified April 3, 1979

WHEELER, *Respondent,*
*v.*
GREEN et al, *Appellants.*
(TC 400-705, SC 24452)

593 P2d 777

[100]

[100-a]

William L. Hallmark, of Jones, Lang, Klein, Wolf & Smith, Portland, argued the cause for appellants. With him on the brief were William A. Davis and Thane W. Tienson, of Jones, Lang, Klein, Wolf & Smith, Portland.

Edward H. Warren, of Hershiser, Mitchell & Warren, Portland argued the cause for respondent. With him on the brief were Michael A. Lehner and Donald E. Hershiser, of Hershiser, Mitchell & Warren, Portland.

Before Holman, Presiding Justice, and Tongue, Howell, Bryson, Lent and Linde, Justices.

LENT, J.

## LENT, J.

This appeal requires our consideration of several aspects of the law of defamation. Constitutional, statutory, and common law issues are presented. Some, but unfortunately not all, of the complexities presented to the trial court can be disregarded for purposes of this appeal.

*Facts*

Plaintiff R. C. ("Bucky") Wheeler is a professional trainer of Appaloosa race horses. He is well known as a trainer among the public of Appaloosa racing, and in 1972 and 1973 was named "Trainer of the Year" by the Appaloosa Horse Club, the national governing body of Appaloosa horse racing. That award generated a certain amount of publicity.

The individual defendants, Green and Wassenberg, decided in 1972 to acquire Appaloosa horses for racing. These two defendants are the sole owners of defendant United Industrial Electric, Inc., which is, in turn, the sole owner of a subsidiary corporation, defendant United Industrial Control, Inc. Green and Wassenberg raced their horses under the name "Green Acres Appaloosas," and are also named as defendants as members of a partnership of that name.

Green and Wassenberg were not experienced race horse owners, and in 1972 they hired Wheeler to advise them on purchasing horses and to train and race those horses for them. He acted as their trainer from the fall of 1972 until they became dissatisfied with his services and discharged him in the fall of 1973.

In this action Wheeler sought to recover damages for a number of defamatory statements made after Green and Wassenberg had discharged him as their trainer. Eight causes of action were submitted to the jury. On three of these causes, the jury's verdict was in favor of all defendants, and no issues are raised on appeal in that connection. On the five other causes of

[101]

action, verdicts were returned in favor of plaintiff Wheeler. The record contains evidence from which the jury must have found the following events, or significant portions of them, to have occurred:

1. Green, during a dinner conversation, told Mr. Bates, who was also an owner of Appaloosa race horses and who employed Wheeler as trainer, that Wheeler wasn't "training to the best of his ability in regard to the owners," and that he thought Wheeler was dishonest. He also told Bates that when he, Green, had objected to Wheeler's entering Green's horse in a race against Bates's faster horse, Wheeler had beaten Bates's horse with a chain in an attempt to have him scratched from the race.

2. Green, in a telephone conversation, told the secretary of the Washington State Appaloosa Association that Wheeler had bribed race officials and jockeys, that he had "paid off" gate men, that he had had Green's horse "held" at the starting gate so that another horse would win a race, and that he had forged one of Green's checks.

3. Green, during a telephone conversation with Edward Heinamann, executive secretary of the Washington State Racing Commission, said that Wheeler had forged one of Green's checks.

4. Green and Wassenberg sent a letter to Martin Saidleman, publisher of *The Appy,* a newsletter for followers of Appaloosa racing, referring to their prior employment of Wheeler, their shock at the "dirty tricks, lack of ethics and sportsmanship connected with the Appaloosa horse business," stating that these practices amounted to "extortion, bribery, forgery, intimidation, graft, corruption, fraud, income tax evasion, etc.," and that their first step in an attempt to discourage these unethical practices had been to fire Wheeler for misconduct. The letter, written on the letterhead of United Industrial Electric, was later

published in *The Appy.*[1] Although the letter was sent to Saidleman at his home address, the jury must have found that Green and Wassenberg either intended or should reasonably have expected that it would be published.

5. Green and Wassenberg later sent a letter, also written on the corporate letterhead, to Richard Stanger, president of the Appaloosa Horse Club, complaining about the activities of an unnamed "supertrainer" who deceived and sneered at new horse owners, lost their equipment, forged their checks, and manipulated the figures in their accounts. The jury must have found that those who read the letter understood that "supertrainer" referred to Wheeler. Green and Wassenberg sent a copy of this letter to *The Appy,* which published it.

The jury must also have found that the defamatory statements made on each of these occasions were false.

The jury awarded both general and punitive damages on each of the above causes of action, as follows:

| | | |
|---|---|---|
| 1. | $ 1,000 general, | $ 5,000 punitive against all defendants |
| 2. | 12,000 general, | 15,000 punitive against all defendants except Wassenberg individually |
| 3. | 12,000 general, | 15,000 punitive against all defendants except Wassenberg individually |
| 4. | 75,000 general, | 125,000 punitive against all defendants |
| 5. | 50,000 general, | 100,000 punitive against all defendants |

As to causes No. 2 and No. 3, the trial court granted judgment notwithstanding the verdict in favor of all defendants except Green. In other respects, judgment was entered on the jury's verdict. All of the defendants appeal.

*Non-constitutional arguments for a directed verdict*

Defendants contend that they were entitled to a directed verdict because each of the above defamatory

---

[1] Accompanying the letter, and also published in *The Appy,* was a "reward poster" offering rewards to persons who made successful complaints, resulting in decisions favorable to defendants, about racing violations.

statements was, as a matter of law, within the protection of a qualified privilege. They claim that each of the statements was covered by one or more of the following: The "common interest" privilege,[2] the "public interest" privilege,[3] and the "business interest" privilege.[4] Denial of a directed verdict on these grounds was not error.

Assuming that the occasions for the statements afforded the defendants a qualified privilege, such a privilege may be forfeited in several ways. *See, generally, Schafroth v. Baker,* 276 Or 39, 553 P2d 1046 (1976). Of particular relevance here, a privilege may be forfeited by abuse if the defendant's primary purpose in making the defamatory statement was improper and unrelated to the purpose of the privilege. *Schafroth v. Baker, supra,* 276 Or at 46-47. The jury was so instructed in this case, and there was evidence which permitted a finding that defendants acted primarily for the purpose of harming Wheeler. Although there was also evidence to the contrary, the jury was not obliged to believe it. The trial court did not err in submitting the issue of loss or abuse of privilege to the jury.

As to the Stanger letter, a copy of which was also sent to *The Appy,* defendants contend that there was no evidence that the recipients understood the statements in the letter to refer to Wheeler. Stanger did not testify, and no one from *The Appy* gave direct evidence on this point. Nevertheless, we conclude that the issue was properly submitted to the jury.

When this letter was received, the publisher of *The Appy* had already received the earlier letter from Green and Wassenberg in which they described in strong terms their disenchantment with the conditions

---

[2] Citing *Cribbs v. Montgomery Ward & Co.,* 202 Or 8, 272 P2d 978 (1954).

[3] Citing *Schafroth v. Baker,* 276 Or 39, 553 P2d 1046 (1976).

[4] Citing *Wattenburg v. United Medical Laboratories, Inc.,* 269 Or 377, 525 P2d 113 (1974).

prevailing in Appaloosa racing during the previous two years. That letter made it clear that they considered Wheeler responsible, at least in part, for some of the improper activities which they mentioned. That letter states that Green and Wassenberg "would like to give you a detailed story from 1972 to the present of what happened to two businessmen and sportsmen who invested two hundred thousand dollars in the Appaloosa horse business." It is also clear from that letter that Wheeler was their trainer during a major part of that period. That letter was featured on the front page of *The Appy* under an editorial statement referring favorably to certain suggestions in the letter.

Shortly after the first letter, the paper received the letter which now concerns us. It questions whether the Appaloosa leading trainer award represents "honesty, sportsmanship, hard work, ethics, etc.," or whether a "lust" for that award "has turned Appaloosa racing into a free-for-all." Immediately following begins the chronicle of the misdeeds of "supertrainer." The letter was featured in a double-page spread in the next issue of *The Appy,* preceded by an editorial note that the letter "tells of the frustrations encountered by two novice horsemen, detailing some of the problems they discovered. . ."

From all of this, the jury could infer that the editors of *The Appy,* and its readers, must have understood the references to "supertrainer" to be a part of the "detailed story" of their own experiences which Green and Wassenberg had offered in the original letter, and that they would understand that "supertrainer" referred to Wheeler, who had been employed by Green and Wassenberg and who had received the Trainer of the Year Award for two years in a row.

■   Direct testimony of the recipients' understanding of the defamatory nature of a libel is not required if other evidence is sufficient to permit an inference of such an understanding. In *Beecher v. Montgomery Ward & Co., Inc.,* 267 Or 496, 500, 517 P2d 667 (1973) and *Glenn v.*

[105]

*Esco Corp.,* 268 Or 278, 520 P2d 443 (1974) we held that the jury could infer, from sufficient indirect evidence, that the recipients understood the publications to have a defamatory meaning. Similarly, the jury may infer from indirect evidence that the recipient understood that a defamatory statement referred to the plaintiff. The evidence here was sufficient to permit that inference.

### Constitutional arguments for a directed verdict

Defendants contend that Wheeler is a public figure and that he may not, therefore, recover for defamation in the absence of proof, presented with "convincing clarity," that the publication was made "with knowledge that it was false or with reckless disregard of whether it was false or not." They also contend that there was no such proof in the present case as to any of the causes of action with which we are concerned on this appeal.

The quoted language is from *New York Times Company v. Sullivan,* 376 US 254, 279-80, 285-86, 84 S Ct 710, 11 L ed 2d 686 (1964), which applied the rule to defamations of public officials. In subsequent cases the rule has been refined and has been extended to "public figures" as well as to public officials. *See, especially, Curtis Publishing Co. v. Butts,* 388 US 130, 87 S Ct 1975, 18 L ed 2d 1094 (1967); *Gertz v. Robert Welch, Inc.,* 418 US 323, 94 S Ct 2997, 41 L ed 2d 789 (1974); *Time, Inc. v. Firestone,* 424 US 448, 96 S Ct 958, 47 L ed 2d 154 (1976).

We recently discussed the line of cases beginning with *New York Times* in *Harley-Davidson v. Markley,* 279 Or 361, 568 P2d 1359 (1977), which was a libel action between private parties involving a defamatory statement in a business letter. We held there that the rules announced by the United States Supreme Court had no application to the facts we were considering:

"In the instant case there is no public official or figure as plaintiff, there is no issue of public concern, and *there is no media defendant.* The crucial elements in the above cases which brought the United

States Supreme Court into the field of defamation law are missing. There is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press. The facts of the present case are wholly without the First Amendment concerns with which the Supreme Court of the United States has been struggling." 279 Or at 366 (emphasis in original; footnote omitted).

Plaintiff here seizes on our emphasis in *Harley-Davidson* on the lack of a media defendant, and contends that because there is no media defendant in the present case, *Harley-Davidson* governs and the constitutional rules evolved by the United States Supreme Court have no application. The matter is not quite that simple.

In the *New York Times* case itself, the Supreme Court held that individual non-media defendants, as well as the newspaper publisher, were protected by the newly-adopted rule that a public official could recover for defamation only if he proved that the statement was made with knowledge that it was false or with reckless disregard as to whether it was false or not. Later cases have afforded the same protection to other private individuals. *Garrison v. Louisiana,* 379 US 64, 85 S Ct 209, 13 L ed 2d 125 (1964); *Henry v. Collins,* 380 US 356, 85 S Ct 992, 13 L ed 2d 892 (1965); *St. Amant v. Thompson,* 390 US 727, 88 S Ct 1323, 20 L ed 2d 262 (1968).[5]

The United States Supreme Court has not, apparently, decided any cases in which a "public figure" sought damages from a non-media defendant. However, in *Curtis Publishing Co. v. Butts, supra,* the *New*

---

[5] In *Harley-Davidson, supra,* we erroneously stated that all of the United States Supreme Court cases limiting actions for libel under the First Amendment involved media defendants. That was true of the cases cited to us on this issue and discussed in the opinion. There were, however, no media defendants in *Garrison, Henry,* or *St. Amant.*

*York Times* rule was expressly extended to defamations of public figures as well as of public officials. The *New York Times* rule, as we have said, applies to all defendants, not only to those connected with the media. The rationale in *New York Times* focuses on the importance of the protection of freedom for debate on public issues and individual freedom of expression, particularly the freedom to criticize government. There is nothing in *Curtis Publishing Co.* to indicate that the Court, when it expanded the constitutional protection to defamation affecting a broader class of plaintiffs, intended to limit that protection to a narrower class of defendants.

*Gertz v. Robert Welch, Inc., supra,* introduces a note of uncertainty on this question. That case was an action against the publisher of a magazine. There was no non-media defendant. A majority of the Court held in that case: (1) the plaintiff was not a public figure for purposes of the *New York Times* rule as extended in *Curtis Publishing Co.;* (2) the *New York Times* rule does not apply in actions by private plaintiffs; (3) private plaintiffs, when suing a publisher or broadcaster, need not show knowing falsity or reckless disregard for truth on the part of the defendant; (4) in such cases, the states may set their own standards of liability so long as they do not impose liability without fault; (5) in such cases, private plaintiffs may not recover presumed or punitive damages, but may only recover for actual injury, unless they prove the defendant's statement was made with knowledge of its falsity or with reckless disregard for the truth.[6]

Unlike the earlier cases, *Gertz* appears to be limited, both in its holding and in the rationale expressed by the majority, to actions against defendants involved in publishing or broadcasting. Mr. Justice Powell's opinion for the majority repeatedly expresses

---

[6] The "reckless disregard" standard was further considered in *St. Amant v. Thompson, supra,* where it was said that the publisher must act with a "high degree of awareness * * * of probable falsity." 390 US at 731.

the Court's concerns in terms of the liability of the media. The following excerpts are examples.

"The principal issue in this case is whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege against liability for the injury inflicted by those statements." 41 L ed 2d at 801.

"Our decisions recognize that a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to intolerable self-censorship. Allowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to First Amendment liberties." *Id.* at 805-06.

"The need to avoid self-censorship by the news media is, however, not the only societal value at issue * * * .

"The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehoods * * * .

"Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury." *Id.* at 806.

"* * * the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehoods concerning them. No such assumption is justified with respect to a private individual." *Id.* at 808.

"We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 809.

"We also find no justification for allowing awards of punitive damages against publishers and broadcasters held liable under state-defined standards of liability for defamation." *Id.* at 811.

[109]

The majority opinion does contain other language referring to First Amendment freedoms generally, and to freedom of speech as well as freedom of the press. Neither the majority opinion nor any of the separate opinions explains, or even expressly acknowledges, the shift in rationale from that of the earlier cases, focusing on the importance of free debate among citizens, to that in *Gertz* which focuses on the role and protection of the media. Nevertheless, we think that emphasis in *Gertz* is too pronounced to be anything other than deliberate. To the same effect, *see* Shiffrin, Defamatory Non-Media Speech and First Amendment Methodology, 25 UCLA L Rev 915, 935-36 (1978):

> "* * * *Gertz* implies that at least when no public person plaintiff is involved, media defendants will be accorded constitutional protection and non-media defendants will not. The Court is unwilling to permit the rigors of the common law to impact on speech likely to be of general or public interest (media speech) but is apparently willing to tolerate the rigors of the common law with respect to speech unlikely to relate to issues of public importance (non-media speech not involving public persons) and is apparently unwilling to attempt on a general basis to determine which speech relates to issues of public importance and which does not."

■ Although we acknowledge that there is authority to the contrary, we conclude that we were correct when we held in *Harley-Davidson v. Markley, supra,* that the rules first announced in *Gertz,* applicable to cases in which the plaintiff is neither a public official nor a public figure, apply only to actions against media defendants.

■■ There is, however, nothing in *Gertz* which suggests that the cases applying the *New York Times* rule to non-media defendants were incorrect or would not be followed in future actions brought by public officials or public figures. The Court's concern in those cases to provide adequate protection for freedom of public debate on issues of public importance has not been repudiated. We conclude that all defendants, not only

those associated with the media, continue to be protected by the *New York Times* rule in cases involving comment upon public officials and public figures.

We must, then, determine whether Wheeler, the plaintiff in this case, is a public figure.[7] If he is, the defendants are entitled to an examination of the evidence on each cause of action in order to determine whether there was adequate proof to submit to the jury that the defendants made the statements knowing they were false or with reckless disregard as to their falsity. We begin by examining the United States Supreme Court cases which have discussed the question.

*Curtis Publishing Co., supra,* was actually two cases. The plaintiff in one was former General Edwin Walker, whom the opinion described as follows:

> "Walker was a private citizen at the time of the riot and publication. He had pursued a long and honorable career in the United States Army before resigning to engage in political activity, and had, in fact, been in command of the federal troops during the school segregation confrontation at Little Rock, Arkansas, in 1957. He was acutely interested in the issue of physical federal intervention, and had made a number of strong statements against such action which had received wide publicity. Walker had his own following, the 'Friends of Walker,' and could fairly be deemed a man of some political prominence." 388 US at 140.

The plaintiff in the other case was a nationally-known sports figure, whom the court described as follows:

---

[7] Defendants contend that the trial court erred in submitting to the jury the question whether plaintiff is a public figure. They are correct in their argument that when the facts are not in dispute this is a question for the court. In *Roseblatt v. Baer, supra,* 383 US 75, 88, 86 S Ct 669, 15 L ed 2d 597 (1966), the United States Supreme Court held that whether plaintiff was a public official was a question for the court. This is consistent with the general rule that the court, not the jury, determines whether a defamatory statement was made on a privileged occasion. *See, generally,* 1 Harper and James, Torts, 466-67 (1956); Prosser, Torts, 796 (4th ed 1971). Because of our disposition of the merits of the issue, the trial court's submission of the question to the jury could not have prejudiced defendants.

"* * * At the time of the article, Butts was the athletic director of the University of Georgia and had overall responsibility for the administration of its athletic program. Georgia is a state university, but Butts was employed by the Georgia Athletic Association, a private corporation, rather than by the State itself. Butts had previously served as head football coach of the University and was a well-known and respected figure in coaching ranks. He had maintained an interest in coaching and was negotiating for a position with a professional team at the time of publication." 388 US at 135-36.

The Court held that both plaintiffs were public figures, noting that both "commanded a substantial amount of independent public interest at the time of the publications," and observing further that

"* * * Butts may have attained that status by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy, but both commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements." 388 US at 154-55.

In *Greenbelt Publishing Ass'n v. Bresler,* 398 US 6, 90 S Ct 1537, 26 L ed 2d 6 (1970) the plaintiff was a "prominent local real estate developer and builder" in the city where defendant's small weekly newspaper was published, and was also a member of the state legislature from a neighboring district. The Court held it was not necessary to determine whether plaintiff was a public official, because he clearly was a public figure for purposes of the *New York Times* rule:

"* * * Bresler was deeply involved in the future development of the city of Greenbelt. He had entered into agreements with the city for zoning variances in the past, and was again seeking such favors to permit the construction of housing units of a type not contemplated in the original city plan. At the same time the city was trying to obtain a tract of land owned by Bresler for the purpose of building a school.

[112]

Negotiations of significant public concern were in progress, both with school officials and the city council." 398 US at 8-9.

The plaintiff in *Gertz v. Robert Welch, Inc., supra,* was an attorney, apparently prominent in his own community, who was attacked in a magazine article in connection with his representation of a client. The Court held that he was not a public figure; the following quotations are pertinent to its treatment of that issue:

"* * * The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." 418 US at 344, 94 S Ct at 3009, 41 L ed 2d at 807-808.

After noting that a person who decides to seek public office must accept certain necessary consequences of involvement in public affairs, including the "risk of closer public scrutiny than might otherwise be the case" because of the legitimate public interest in an individual's fitness for office, the majority continued:

"Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." 418 US at 345, 94 S Ct at 3009, 41 L ed 2d at 808.

[113]

Similar observations were made later in the opinion:

> "\* \* \* In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." 418 US at 351, 94 S Ct at 3013, 41 L ed 2d at 812.

The plaintiff in that case, the Court said,

> "\* \* \* has long been active in community and professional affairs. He has served as an officer of local civil groups and of various professional organizations, and he has published several books and articles on legal subjects. Although petitioner was consequently well-known in some circles, he had achieved no general fame or notoriety in the community." 418 US at 351, 94 S Ct at 3013, 41 L ed 2d at 812.

The majority held that he had not become a public figure "for all aspects of his life," and found no evidence that he had "thrust himself into the vortex" of the issue which was the subject of the alleged libel, nor had he "engage[d] the public's attention in an attempt to influence its outcome." *Id.* He had not, therefore, become a public figure for the purpose of that issue.

Finally, in *Time, Inc. v. Firestone,* 424 US 448, 96 S Ct 958, 47 L ed 2d 154 (1976), the Court considered a case in which the plaintiff contended she was libeled in a publication describing her divorce proceedings. Plaintiff was a wealthy woman who, prior to her divorce, was quite prominent in local society. Press coverage of her activities was "evidently frequent enough to warrant her subscribing to a press-clipping service." 424 US at 485 (dissent of Marshall, J.) The divorce proceedings themselves became, according to the state court, "a veritable cause celebre in social circles across the country." *Id.* Press coverage was quite extensive, and during the proceedings the plaintiff held several press conferences.

[114]

Nevertheless, the majority held that she was not a public figure:

> "Dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz,* even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public. Nor did respondent freely choose to publicize issues as to the propriety of her married life. She was compelled to go to court by the State in order to obtain legal release from the bonds of matrimony * * *. Her actions, both in instituting the litigation and in its conduct, were quite different from those of General Walker in *Curtis Publishing Co., supra.* She assumed no 'special prominence in the resolution of public questions.'" 424 US at 454-55.

We conclude from this sequence of cases that the Supreme Court has, since its decision in *Curtis Publishing Co.,* altered its standards for determining who is a public figure. Defendants contend that Wheeler is, to that portion of the public which follows Appaloosa racing, a public figure in the same way that Butts was a public figure to that portion of the public which follows football. However, we cannot reconcile the Supreme Court's holding that Butts was a public figure with the standards later enunciated in *Gertz* and *Time, Inc. v. Firestone.* There is no indication that Butts had "thrust himself into the vortex" of any public issue or had attempted to "influence the resolution" of any public controversy. Mrs. Firestone was apparently as well-known to her particular public as was Butts to his. Like Butts, she had chosen to engage in activities which attracted public attention. Her public prominence, like that of Butts', gave her greater opportunities than purely private individuals possess to counter misinformation through access to the media.

Significantly, in the *Firestone* case the majority contrasted Mrs. Firestone's activities with those of General Walker, whose status was considered in the *Curtis Publishing Co.* opinion, but did not attempt any

[115]

comparison with the activities of Butts, the other plaintiff who was held in that same case to also be a public figure. We must conclude that under the principles now applied by the United States Supreme Court, one does not become a public figure simply because of general public interest in one's lifestyle and personal activities or because one's job happens to be one in which widespread publicity is given to outstanding performers.

Defendants have cited a number of cases in support of their contention that plaintiff was a public figure. Those decided prior to *Gertz* and *Time, Inc. v. Firestone* are of no assistance in determining the current state of federal constitutional law. Those decided since the *Firestone* case are not persuasive either because they do not, in our opinion, accurately assess the present position of the United States Supreme Court, *Chuy v. Philadelphia Eagles Football Club,* 431 F Supp 254 (ED Pa 1977) (former professional football player) or because of significant differences in the factual backgrounds. *Wolston v. Readers Digest Association, Inc.,* 429 F Supp 167 (DDC 1977) (individual held in contempt for refusing to testify in grand jury investigation of espionage); *Rosanova v. Playboy Enterprises, Inc.,* 411 F Supp 440 (SD Ga 1976) (individual involved with organized crime).

We conclude that for purposes of application of the rule of *New York Times Co. v. Sullivan,* plaintiff was not a public figure. There was evidence that, because of his success as a trainer, he was very well known to that portion of the public which follows Appaloosa horse racing. There was also evidence that there was, among those engaged in and interested in that sport, a current controversy about the adequacy of the rules and practices governing that sport, and the potential for abuse and dishonest activity. There was, however, no evidence that plaintiff had attempted in any way to influence that controversy or that he had taken any public part in it whatsoever. Until the statements by defendants which are the subject of this case were

made public, the only publicity which plaintiff had received, so far as the record shows, was attributable solely to and concerned only his success as a trainer. There was no showing that he had voluntarily engaged in any activities of the kind the Court indicated in *Gertz* and *Firestone* were significant, nor had he been drawn into any public controversy. For purposes of this case, he is entitled, under the applicable federal law, to whatever protection the state has chosen to afford to the reputations of private persons. Defendants were not, therefore, entitled to a directed verdict even if they were correct in their contention that the evidence would not support a finding of knowing falsity or reckless disregard for the truth.

*Punitive damages for defamation under the Oregon Constitution*

The trial court refused to withdraw the issue of punitive damages from the jury. In contending that that ruling was error, defendants raise an issue which we noted, but which was not raised, in *Harley-Davidson v. Markley, supra,* 279 Or at 372: whether the Oregon Constitution permits the award of punitive damages for defamation. So far as we can determine, that question is now before us for the first time.[8]

Article I, § 8 of the Oregon Constitution provides:
"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

Unlike the First Amendment to the Constitution of the United States, it does not mention separately the

---

[8] In some early opinions, the court assumed that a claim for punitive damages might be recoverable in theory but was improperly submitted to the jury in the particular case. *See, e.g., Lane v. Schilling,* 130 Or 119, 279 P 267, 65 ALR 1042 (1929); *Ruble v. Kirkwood,* 125 Or 316, 266 P 252 (1928). Claims for punitive damages were held properly submitted to the jury in *Glenn v. Esco Corp.,* 268 Or 278, 520 P2d 443 (1974) and *Phelan v. Beswick,* 213 Or 612, 326 P2d 1034 (1958) without constitutional discussion. In *Harley-Davidson v. Markley, supra,* the constitutional attack on punitive damages was based solely on the federal constitution.

[117]

"freedom of the press" and so does not provide support for any distinction between private individuals and members of the media.

Defamatory statements, of course, have throughout the history of this state been recognized as an abuse of the right of free expression for which a person is to be held responsible under the provisions of Article I, § 8. However, when we consider the ways in which a person may be held responsible in a civil action for defamatory speech or writing, we must also consider the provisions of Article I, § 10, which guarantees every person a remedy "by due course of law for injury done him in his * * * reputation." Construing together these two provisions of Article I, both of which have a direct bearing on defamation cases, we hold that in a common-law civil action for damages, the defendant who has abused the right of free expression by defamatory statements may be held responsible only to the extent of permitting the injured party to recover for the resulting injury to reputation—that is, to recover compensatory damages.

As we said recently in *Roshak v. Leathers,* 277 Or 207, 211, 560 P2d 275 (1977):

"For many years it has been recognized in this state that '[t]he generally accepted doctrine [of punitive damages] is that such damages are awarded by way of punishment to the offender and as a warning to others, or according to some authorities, by way of example.' *Martin v. Cambas,* 134 Or 257, 261, 293 P 601, 603 (1930)."

The jury in this case was instructed that punitive damages could be awarded "in order to punish the defendants and to deter others from similar acts." Neither punishment nor deterrence of others is necessary to compensate the plaintiff for injury to reputation.

It is true that Article I, § 8, does not by its terms limit the extent of a defendants' "responsibility" for defamation to that which is required to satisfy the protection which a plaintiff is guaranteed by Article I,

§ 10. In the sensitive area of free expression, however, the threat of large damage recoveries can easily inhibit the exercise of freedom of constitutionally protected expression, as well as its abuse.[9] This is likely to be particularly true in Oregon where the courts, having no power of remittitur, have little or no control over the amounts which juries award as punitive damages.

We are convinced by these considerations that a proper application of Article I, § 8, prohibits the award of punitive damages in defamation cases, unless some other constitutional provision requires that they be allowed. As we have shown, Article I, § 10, the other provision with a direct application to defamation actions, does not. *See Davidson v. Rogers* (concurring opinion by Linde, J.), 281 Or 219, 222, 574 P2d 624 (1978).

We hold, then, that the Oregon Constitution prohibits the award of punitive damages in this case, and that defendants' request that the question of such damages be withdrawn from the jury should have been granted. The judgment must be modified by striking all punitive damage awards.

*Additional constitutional arguments*

Defendants contend, under several assignments of error, that they are entitled to a new trial because the case was presented to the jury on theories which are impermissible under the holdings of the *Gertz* case. Specifically, the trial court instructed the jury that it is presumed from the mere fact that defamatory words are in circulation that some injury to reputation results, refused to instruct the jury that plaintiff could recover only for actual injury, and refused to strike plaintiff's allegations of injury to reputation for lack of any evidence of actual injury. Defendants urge that all of these actions were error because the United

---

[9] *See, generally,* Anderson, Libel and Press Self Censorship, 53 Tex L Rev 422, 477 (1975); Comment, Punitive Damages and Defamation Litigation: A Clear and Present Danger to Free Speech, 64 Yale L J 610 (1955); Comment, The Constitutionality of Punitive Damages in Libel Actions, 45 Ford L Rev 1382 (1977).

States Supreme Court held in *Gertz* that even in cases where the plaintiff is neither a public official nor a public figure, recovery must be limited to compensation for actual injury.

As we have indicated above, our reading of *Gertz* is that this holding applies only in actions against media defendants. *See Harley-Davidson v. Markley, supra.* Nor are we convinced by defendants' argument that the state constitution prohibits an instruction to the jury that some injury to reputation is presumed from the fact that defamatory words are in circulation. Defendants cannot prevail on these assignments of error.

*Statutory contentions*

The two letters written by the defendants, one to the publisher of *The Appy* and one to the president of the Appaloosa Horse Club with a copy to *The Appy*, were, as we have said, published in that journal. On plaintiff's motion, the trial court struck from defendants' answer the affirmative defense that plaintiff had failed to request a correction or retraction of these letters. Defendants assign this ruling as error, relying on ORS 30.160, which provides in part:

"(1) In an action for damages on account of a defamatory statement *published or broadcast in* a newspaper, magazine, other printed periodical, or by radio, television or motion pictures, the plaintiff shall not recover general damages unless:

"(a) A correction or retraction is demanded but not published as provided in ORS 30.165; or

"(b) The plaintiff proves by a preponderance of the evidence that the defendant actually intended to defame the plaintiff." (emphasis added)

It is undisputed that plaintiff did not demand a correction or retraction of any of these materials and that none was published.

The jury awarded both general and punitive damages based on the two letters. As to punitive damages, the trial court had instructed that they could be

awarded upon a finding of malice, which was defined as follows:

"A statement is made maliciously if it is made for an improper purpose,—and I have already instructed upon wanton and reckless disregard—which suggest the probability that it is false and without any attempt, or without an adequate attempt to ascertain whether it is true or false."

Under this instruction, it is possible that the jury awarded punitive damages upon a finding that the statements were made under circumstances suggesting the probability that they were false, and without an adequate attempt to determine whether or not they were true. We cannot, therefore, assume that because the jury awarded punitive damages it found, in the language of the statute, that defendants "actually intended to defame the plaintiff." If the trial court's ruling was error, it was prejudicial.

Defendants point out that the present case, insofar as the causes of action here considered are concerned, is within the literal language of the statute. Those causes of action are for damages on account of defamatory statements which were published in a newspaper. Plaintiff contends that the statute applies only to actions brought against the designated types of media or their employees. In *Holden v. Pioneer Broadcasting Co.,* 228 Or 405, 365 P2d 845 (1961) we construed the statute to include actions against the employees of the designated publishing and broadcasting media, but we have not had occasion to consider whether the statute's coverage is any broader than that. The legislative intent is not entirely clear.

In *Holden,* which involved a number of constitutional challenges to the statute, we said that the challenge based on equal protection grounds is "adequately answered" in the opinion of the California Supreme Court in *Werner v. Southern California Associated Newspapers,* 35 Cal2d 121, 216 P2d 825, 13 ALR2d 277 (1950), appeal dismissed, 340 US 910, 71 S Ct 290, 95 L ed 657 (1951). 228 Or at 417. In the

*Werner* case both the majority and the dissenters treated the California statute as providing protection only to the enumerated types of publishers or broadcasters, although the language of that statute, like that of ORS 30.160, was susceptible of a construction making it applicable to all defamation defendants whose statements have been published or broadcast through the media.

Relying in part on the reasoning in *Werner,* the California court later held that the statute did not apply to an action against a candidate for public office whose press conferences and interviews led to media publication of defamatory statements. *Field Research v. Superior Court,* 71 Cal2d 110, 77 Cal Rptr 243, 453 P2d 747 (1969). An earlier case had held that the statute protected not only publishers and broadcasters, but also others who participated in the publication or broadcast such as reporters, columnists, authors, critics, and editors. *Pridonoff v. Balokovich,* 36 Cal2d 788, 11 Cal Rptr 787, 228 P2d 6 (1951). This holding was reaffirmed in the *Field Research Corporation* case, but lower court decisions which had extended the statute's protection to advertisers[10] and to writers of letters to the editor[11] were disapproved.

Defendants contend that those decisions, disapproved by the California Supreme Court, in fact represent the "better line of authority" and that we should follow them. Those cases are, however, devoid of any analysis on this point, and defendants have not suggested why they are better. We have examined the cases from other jurisdictions involving similar problems under similar statutes, and we find only one which supports defendants' position, and that in dictum which does not demonstrate any careful analysis of either the statutory language or the underlying

---

[10] *Farr v. Bramblett,* 132 Cal App2d 36, 281 P2d 372 (1955).

[11] *Larrick v. Gillson,* 176 Cal App2d 408, 1 Cal Rptr 360 (1959); *Howard v. Southern California Associated Newspapers,* 95 Cal App2d 580, 213 P2d 399 (1950).

policy. *Paul v. National Auction Co.,* 181 NC 1, 105 SE 881 (1921).

■■ Although ORS 30.160(1) is loosely drafted, other provisions of the statute convince us that the legislature probably intended to limit the statutory protection to those involved in the process of publishing or broadcasting. ORS 30.165 requires that the demand for a correction or retraction be addressed to the "publisher of the defamatory statement," who then has two weeks to investigate and to "publish" the correction or retraction "in substantially as conspicuous a manner as the defamatory statement." Although the term "publisher" in the law of defamation may refer to the original writer or utterer, we believe the word is used in the statute in its more generally-understood sense as referring to a media entity of the kinds listed in ORS 30.160(1). It is the "publisher" in that sense who has the power to determine whether or not a correction or retraction shall be printed or broadcast.

Moreover, as the California court pointed out in the *Field Research Corporation* case, none of the reasons for applying the statute to media publishers apply to defamation defendants as a class, or to those whose statements happen to be published or broadcast. They are not under the time pressures imposed by publication or broadcast deadlines; they are not, as a class, especially susceptible to unwarranted defamation suits and claims for excessive damages; and they are not in a position to publish effective retractions.

The trial court was correct in holding the retraction statute was not applicable to this case, and did not err in striking the affirmative defense based on that statute.

### Damages for humiliation and mental anguish
■ Defendants contend that the trial court erred in instructing the jury that it could award compensatory

damages for humiliation and mental anguish resulting from the defamations, arguing that this instruction was not supported either by the pleadings or by the evidence. We hold that this instruction was not error.

Each of the causes of action upon which the jury found for plaintiff is actionable without proof of specific harm, because each accuses him of misconduct or dishonesty in the performance of his profession or employment. *Cook v. Safeway Stores,* 266 Or 77, 82, 511 P2d 375 (1973). In such cases, the general damages for which the jury may award recovery include humiliation and mental suffering. Restatement, Torts, § 623, states:

> "One who is liable to another for a libel or slander is liable also for emotional distress and bodily harm which is proved to have been caused by the defamatory publication or, *in the absence of such proof, for such emotional distress as normally results from such a publication."*

Neither proof not specific pleading of emotional distress is required as a prerequisite to including this element in an award of general damages. *See* 90 ALR 1175, 1184-87 (1934); Prosser, Torts, 761 (4th ed 1971).

The emphasized language has been omitted from Restatement, Second, Torts, § 623, but that change was made in response to the United States Supreme Court's holding in *Gertz,* discussed above, that damages can only be recovered for actual injury. *Id.* at Comment *b.* As we have indicated, we consider that holding applicable only when the action is against a media defendant.

*Other contentions of error in instructions*

Defendants complain that the trial court, when instructing the jury on compensatory damages, told them to take into account, among other things, "all other facts and circumstances surrounding the parties." They argue on appeal that this instruction improperly permitted the jury to consider defendants'

financial circumstances when assessing compensatory damages. We find no reversible error.

The jury was instructed that compensatory damages were to be measured by the injury to plaintiff's reputation, and the resulting humiliation and mental anguish. They were also instructed to take the defendants' financial condition into account when considering punitive damages. Reading the instructions as a whole, we do not believe this incidental general reference to facts and circumstances surrounding the parties would be understood as an invitation to base an award of compensatory damages on the defendants' financial resources.

Defendants also complain of an instruction to the jury that "the defendants do not deny that they made the publication" of each of the two letters. Again, we find no reversible error.

The defendants admitted, in their answer, that they sent the two letters complained of. They object only to the use of the word "publication" in the instruction to the jury. Although this use of the word in its defamation law sense might have been confusing, if it stood alone, when applied to the facts of this case, it did not stand alone. The jury was specifically instructed that defendants would be liable for the *newspaper* publication "if and only if * * * the publication of the letter in the newspaper was authorized or intended by the defendants," or that they reasonably could have expected such a newspaper publication. We do not believe the jury was misled by the instruction complained of.

*Liability of some defendants for statements by another*

With respect to the statement of Green to Mr. Bates that plaintiff had beaten Bates's horse, the jury's verdict was against all defendants, and the trial court entered judgment accordingly. The trial court erred in refusing to direct a verdict on that cause of action in favor of all defendants except Green.

[125]

The statement was made during a social occasion. There was evidence that Wassenberg was present at the time, but no evidence whatsoever that Wassenberg even participated in this part of the conversation. The jury could not have found, on the evidence before it, that he indicated agreement with Green's statement, or that he joined in any way in making it. There was clearly no evidentiary basis for finding him directly liable for this statement.

There was evidence from which the jury could find that Green and Wassenberg were partners, under the name of Green Acres Appaloosas, in the business of racing horses. Partners are jointly and severally liable for the tortious acts of other partners if they have authorized those acts or if the wrongful acts are committed "in the ordinary course of the business of the partnership." ORS 68.250, 68.270. Assuming the jury found the existence of a partnership, however, the evidence was still insufficient to warrant a finding that Wassenberg was vicariously liable for Green's statement. There was no evidence to support a finding that Wassenberg authorized Green to speak for the partnership in this way, and no basis for finding that this kind of dinner conversation was within the "ordinary course" of the partnership business. Wassenberg was entitled to a directed verdict.

For similar reasons, the corporate defendants were also entitled to a directed verdict on this cause of action. There was evidence from which the jury could have found that at least one of the corporations, rather than a partnership, was carrying on the racing business. There was, however, no evidence which would warrant a finding that Green was acting in furtherance of the corporation's business, or within the scope of his authority as an officer, when he made the statement. *See, generally,* 10 Fletcher, Corporations, §§ 4887, 4888 (Perm ed 1978). On this cause of action, therefore, judgment must be entered in favor of all defendants except Green.

[126]

Defendants make other assignments of error which might, if well taken, require a complete retrial of the case but which we do not discuss for various reasons. Some were not properly raised at trial and preserved for appeal, and others are disposed of by what we have said above. Defendants are not entitled to a new trial.[12] The judgment must be modified by eliminating the award of punitive damages and by entering judgment in favor of all defendants except Green on the cause of action based on Green's statement to Bates. In other respects, the trial court's judgment is affirmed.

---

[12] Plaintiff, who did not cross-appeal, has attempted to assign as error the granting of judgment in favor of all defendants except Green, notwithstanding the verdict, on two of plaintiff's causes of action. He cites *Artman v. Ray*, 263 Or 529, 501 P2d 63, 502 P2d 1376 (1972) in support of his contention that we should consider this alleged error in spite of his failure to cross-appeal. That case held, however, that a respondent need not file a cross-appeal in order to be permitted to allege error under certain circumstances if he is not contending that the judgment was in error. 263 Or at 533. Plaintiff's assignment of error in this case attacks the judgment itself, and cannot be considered in the absence of a cross-appeal.

Argued June 6, 1978, affirmed April 3, 1979

## WOOTTEN, *Respondent,*
## *v.*
## DILLARD, *Appellant.*
## (No. TC A7602 01683, SC 25239)

592 P2d 1021

A. Thomas Cavanaugh, Portland, argued the cause for appellant. With him on the briefs were Richard C. Pearce and A. Thomas Cavanaugh, P. C., Portland.

Eric C. Larson, of Larson & Sharp, Gresham, argued the cause and filed a brief for respondent.

LENT, J.

**LENT, J.**

This is an action for damages for personal injuries brought by a guest against his host driver. Defendant appeals from a judgment on a jury verdict for plaintiff. The primary issue is whether there is evidence from which the jury could find that plaintiff's injuries resulted from gross negligence on the part of the defendant. We find there is and affirm.

For some 18 years now the parties and the courts have been wont, in cases governed by the guest passenger law, to commence analysis with *Williamson v. McKenna*, 223 Or 366, 354 P2d 56 (1960). Whenever this court (or the trial court) decides a close case against the host, the court is accused of not being true to the precepts of *Williamson.* We believe it is of some value, therefore, to examine just what that case requires of judges and juries.

The facts in *Williamson* were governed by what was then ORS 30.110:

> "No person transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause of action for damages against the owner or operator for injury, death or loss, in case of accident, unless the accident was intentional on the part of the owner or operator or caused by his gross negligence or intoxication or his reckless disregard of the rights of others."

After reviewing quite comprehensively an array of cases construing similar statutes and our own, this court rejected the concept that "gross negligence" could be identified as a separate form of conduct from that of "recklessness," which was equated with the statutory language, "reckless disregard of the rights of others."[1] The opinion stated that the concept of recklessness:

---

[1] This writer, speaking only for himself, has had some questions concerning some aspects of *Williamson v. McKenna.* The opinion makes no reference to *State v. Wilcox,* 216 Or 110, 337 P2d 797 (1959) decided just 15 months earlier holding that under the negligent homicide law "gross

---

negligence" meant something other than recklessness. A fair reading of *Wilcox* will disclose that the court found "gross negligence" to be a lesser form of misconduct than recklessness. Both opinions were authored by the same member of the court, and the author had *Wilcox* in mind as late as the writing of his concurring opinion in *Burghardt v. Olson*, 223 Or 155, 349 P2d 792, 354 P2d 871 (1960) handed down in February, 1960. Yet in *Williamson* after examining the gamut of misconduct "ranging in infinite gradations from the slightest inadvertence to the most malicious purpose to inflict injury" the opinion finds "there is no place in the plan for gross negligence." 223 Or at 373.